## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

───────────────────────────────────────────────
          :

**SECURITIES AND EXCHANGE COMMISSION**   :
**100 F St., NE**   :
**Washington, DC 20549,**   :
    :
       **Plaintiff,**   :
    :
       **v.**   :   **Civil Action No. _____**
    :
**FEDERAL HOME LOAN**   :
   **MORTGAGE CORPORATION,**   :
**DAVID W. GLENN,**   :
**VAUGHN A. CLARKE,**   :
**ROBERT C. DEAN, and**   :
**NAZIR G. DOSSANI,**   :
    :
       **Defendants.**   :
───────────────────────────────────────────────:

## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("Commission") alleges for its Complaint:

## SUMMARY OF ALLEGATIONS

1.    Between 1998 and 2002, Federal Home Loan Mortgage Corporation ("Freddie Mac" or the "Company"), a company chartered by Congress for the purpose of providing a stable market for residential mortgage financing in the United States, engaged in fraudulent conduct that deceived investors about its true financial performance, profitability, and growth trends. The conduct was the direct result of a corporate culture that placed great emphasis on steady earnings, and fostered a corporate image that was touted as "Steady Freddie" to the marketplace. The Company presented itself to investors as a company that consistently achieved high quality earnings growth when, in fact, the Company's earnings were volatile and deeply impacted by changes in certain accounting rules.

2.     The Company's misconduct took varied forms.  First, the Company engaged in a series of transactions having principally an accounting purpose that were designed to minimize or eliminate the true impact of changes in Generally Accepted Accounting Principles ("GAAP") – specifically SFAS 133, which introduced additional earnings volatility  – and that allowed the Company to falsely portray stable earnings growth and reduced income statement volatility. Second, the Company engaged in transactions that shifted income from the current periods into future periods, thereby enabling the Company to show a smooth growth pattern in earnings, and that assisted it in meeting future projections.   As set forth below, the Company's public statements failed adequately to inform investors of the impact of changes in the accounting regulations and thereby concealed the significance of these transactions from investors in the manner described below.

3.     On January 22, 2003, Freddie Mac announced that it would revise its reported earnings for 2001 and 2002.  On November 21, 2003, the Company disclosed the results of its restatement for 2000, 2001 and 2002.   The Company's restatement revealed that it had misreported its net income in each of those years – by 30.5%, 23.8% and 42.9%, respectively.  It also revealed that the picture it previously had presented to investors of an enterprise with steadily growing and predictable GAAP earnings was false, stating that "Freddie Mac's restated net income reflects significantly greater volatility than previously reported, and the company anticipates that its net income for periods following the restatement will continue to reflect greater volatility than previously reported from quarter to quarter."

4.     The  following  table  sets  forth  and  compares  Freddie  Mac's  net  income  as originally reported for 2000, 2001 and 2002, and as restated:

| Year | Reported Net Income | Restated Net Income | Change | Percent Change |
|------|---------------------|---------------------|--------|----------------|
| 2000 | $2.547 billion | $3.666 billion | $1.119 billion | 30.5% |
| 2001 | $4.147 billion | $3.158 billion | ($989 million) | (23.8%) |
| 2002 | $5.764 billion | $10.090 billion | $4.326 billion | 42.9% |

The sizeable difference between the Company's reported and subsequently restated net income demonstrates the extent to which it "smoothed" its earnings. The Company's combined net income for 2000 and 2001 was approximately $6.6 billion, but, income that should have been reported in 2000 was shifted to 2001 to show smooth and steady growth. Had the Company reported income properly for those years, as in the restatement, it would have shown an earnings *decrease* of over $500 million between 2000 and 2001. The Company also originally underreported its 2002 net income by more than $4 billion, which it corrected with the restatement.

5. As a result of such actions, defendant Freddie Mac violated the antifraud provisions of the federal securities laws – Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] thereunder.

6. The Company's President, David W. Glenn; Chief Financial Officer, Vaughn A. Clarke; and two company senior vice presidents – Nazir G. Dossani and Robert S. Dean – participated in, or directed, the violative conduct alleged. Specifically, defendants Glenn, Clarke, Dean and Dossani negligently violated Section 17(a)(2) and (3) of the Securities Act.

7. By virtue of the foregoing conduct, the Company directly or indirectly, engaged in and, unless enjoined, will continue to engage in transactions, acts, practices and courses of business which constitute violations of Section 17(a) of the Securities Act and/or Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and defendants Glenn, Clarke, Dean and Dossani, directly or indirectly, engaged in and, unless enjoined, will continue to engage in

transactions, acts, practices and courses of business which constitute violations of Section 17(a)(2) and (3) of the Securities Act.

8.      The Commission seeks an order permanently enjoining the defendants from further violations of the federal securities laws as alleged herein.  The Commission also seeks disgorgement from the defendants together with the imposition of civil monetary penalties.

## JURISDICTION AND VENUE

9.      The Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e), and 78aa] and 28 U.S.C. §1331.

10.     Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §78aa].

11.     In connection with the transactions, acts, practices and courses of business alleged in this Complaint, defendants, directly or indirectly, made use of the means or instrumentalities of interstate commerce or of the mails.  Some of these transactions, acts, practices and courses of business occurred within the District of Columbia.

## DEFENDANTS

12.     **Freddie Mac** is a shareholder-owned government-sponsored organization ("GSE") established by the U.S. Congress on July 24, 1970, to provide a continuous flow of funds for residential mortgages.  The Company performs this function by buying and guaranteeing residential mortgage loans and mortgage-related securities, which it finances by issuing mortgage-related securities, debt securities, and equity securities.  Freddie Mac's securities are exempt from registration under the federal securities laws, but, at all relevant times, Freddie Mac disseminated to the investing public annual and quarterly reports of its financial

condition and results of operations that were virtually identically in presentation to reports filed with the Commission by registrants. Freddie Mac's public financial statements also purported to be presented in accordance with GAAP. Moreover, on August 14, 2002, certain Company executives voluntarily provided the Commission with a copy of a certification of the accuracy and completeness of its financial disclosures in its 2001 Information Statement and first and second quarter 2002 Information Statement Supplements. In a press release issued on August 14, 2002, the Company explained that "[t]hese certifications reinforce Freddie Mac's commitment to providing investors the information they need so that we can attract capital to finance housing for America's families." At all relevant times, the Company's principal offices were located in McLean, Virginia, and its common stock was actively traded on the New York Stock Exchange under the ticker symbol "FRE."

13.    **David W. Glenn**, age 62, was President and Chief Operating Officer of Freddie Mac from 1990 until June 2003, when he resigned from the Company. He was a member of the Company's board of directors from 1990 to 2003 and served as the Vice Chairman of the board from 2000 to 2003. He was the Executive Vice President/Finance and Chief Financial Officer from November 1987 to November 1989 and Executive Vice President and Chief Operating Officer from November 1989 to March 1990. Glenn is a resident of Virginia.

14.    **Vaughn A. Clarke**, age 53, was Freddie Mac's Senior Vice President of Finance from September 1998 to November 2000 and Chief Financial Officer from November 2000 until his resignation from the Company in June 2003. He served as acting Chief Financial Officer from March 2000 until November 2000 when he formally assumed the office. Clarke is a resident of Maryland.

15.    **Robert C. Dean**, age 42, was a Vice President of Freddie Mac from February 1998 through June 2000 and Senior Vice President of the Company in its Market Risk Oversight department from June 2000 through October 2003, when he resigned from the Company. Dean is a resident of Virginia, and has been a certified public accountant ("CPA") since 1985.

16.    **Nazir G. Dossani**, age 64, joined Freddie Mac in February 1993. He was Senior Vice President/Investments within Freddie Mac's Funding and Investments division from 1998 to August 2005, when he retired from the Company. He is a resident of Virginia.

## FREDDIE MAC'S EARNINGS MANGEMENT SCHEME

### *Generally*

17.    From at least the second quarter of 1998 through and including the third quarter of 2002, Freddie Mac carefully managed the earnings, and other financial metrics it reported to the public, through the multi-faceted and pervasive methods described below. The most senior management of the Company, including its Chief Executive Officer, consistently pressured the Company to undertake to report smooth and dependable earnings growth and to present investors with the image of a company whose asset base of mortgages and mortgage-related securities was capable of, and positioned to, continue to generate predictable and growing earnings. This pressure from the senior-most levels of the Company significantly contributed to the "Steady Freddie" culture, which in turn resulted in the violative conduct described below. In turn, the Company's accounting policies and public disclosures shared the common purpose of reinforcing investors' perceptions of the dependability and quality of the Company's earnings and earnings potential.

### *Freddie Mac's Public Financial Reporting*

18.    Freddie Mac reported its financial results for full fiscal years in "Information Statements" and "Annual Reports" which included Company audited financial statements that purported to conform with GAAP.  These reports included sections entitled "Management's Discussion and Analysis," which provided commentary on the Company's financial performance and other factors important to the Company's business and financial prospects.  The Company's quarterly reports were presented in "Information Statement Supplements" (in its single version, an "ISS").  In connection with the dissemination of its annual and quarterly reports, Freddie Mac publicly issued a press release, or "Earnings Release," announcing its financial results.  These earnings releases often included additional commentary by Company management.

19.    The table below sets forth the publication date and/or date affixed to the document, the report type, and relevant reporting period for each document containing at least one instance of violative conduct set forth herein:

| Date | Reporting Period | Type of Report |
|------|------------------|----------------|
| Undated | Second Quarter 1998 | Information Statement Supplement |
| Undated | Third Quarter 1998 | Information Statement Supplement |
| Undated | Fourth Quarter 1998 | Information Statement Supplement |
| Undated | Full Year 1998 | Information Statement |
| Undated | Full Year 1998 | Annual Report |
| Undated | First Quarter 1999 | Information Statement Supplement |
| April 15, 1999 | First Quarter 1999 | Earnings Release |
| Undated | Second Quarter 1999 | Information Statement Supplement |
| July 15, 1999 | Second Quarter 1999 | Earnings Release |
| Undated | Third Quarter 1999 | Information Statement Supplement |
| Undated | Fourth Quarter 1999 | Information Statement Supplement |
| March 31, 2000 | Full Year 1999 | Information Statement |
| Undated | Full Year 1999 | Annual Report |
| January 18, 2000 | Full Year 1999 | Earnings Release |
| April 18, 2000 | First Quarter 2000 | Earnings Release |
| May 15, 2000 | First Quarter 2000 | Information Statement Supplement |
| July 18, 2000 | Second Quarter 2000 | Earnings Release |
| August 14, 2000 | Second Quarter 2000 | Information Statement Supplement |
| November 14, 2000 | Third Quarter 2000 | Information Statement Supplement |
| January 31, 2001 | Fourth Quarter 2000 | Information Statement Supplement |

| March 26, 2001 | Full Year 2000 | Information Statement |
|---|---|---|
| Undated | Full Year 2000 | Annual Report |
| January 18, 2001 | Full Year 2000 | Earnings Release |
| April 24, 2001 | First Quarter 2001 | Earnings Release |
| May 15, 2001 | First Quarter 2001 | Information Statement Supplement |
| July 18, 2001 | Second Quarter 2001 | Earnings Release |
| August 14, 2001 | Second Quarter 2001 | Information Statement Supplement |
| October 17, 2001 | Third Quarter 2001 | Earnings Release |
| November 14, 2001 | Third Quarter 2001 | Information Statement Supplement |
| January 31, 2002 | Fourth Quarter 2001 | Information Statement Supplement |
| March 21, 2002 | Full Year 2001 | Information Statement |
| Undated | Full Year 2001 | Annual Report |
| January 22, 2002 | Full Year 2001 | Earnings Release |
| April 23, 2002 | First Quarter 2002 | Earnings Release |
| May 15, 2002 | First Quarter 2002 | Information Statement Supplement |
| July 23, 2002 | Second Quarter 2002 | Earnings Release |
| August 14, 2002 | Second Quarter 2002 | Information Statement Supplement |
| October 23, 2002 | Third Quarter 2002 | Earnings Release |
| November 14, 2002 | Third Quarter 2002 | Information Statement Supplement |

### *The SFAS 133 Transition*

20.     In June 1998, the Financial Accounting Standards Board ("FASB") released Statement of Financial Accounting Standards No. 133 ("SFAS 133"), which related to accounting for derivative instruments and hedging activities.    Derivatives are financial instruments, such as options or futures contracts, whose value depends on the value of another "underlying" security or asset.    Financial companies such as Freddie Mac frequently use derivatives to manage interest rate and other risk.    SFAS 133 provided generally that, commencing January 1, 2001, holders of derivatives must account for such assets at fair value. SFAS 133 also set out detailed rules concerning when a company could use hedge accounting to account for the changes in the value of a derivative as hedging the change in the fair value or future cash flows of a hedged asset or liability.    The requirements of SFAS 133 represented a significant change from the accounting practices required by GAAP before SFAS 133 was issued.

21.     For Freddie Mac, a major holder of derivatives subject to SFAS 133, the new standard required the Company to revalue and "mark to market" (i.e., report at actual quoted market prices or estimated market value) its portfolio of derivatives every reporting period. Changes in the fair value of certain derivatives were required by SFAS 133 to be recorded as income or loss on the Company's income statement.

22.     The impact of the adoption of SFAS 133 – described in greater detail below – would be dramatic.  Specifically, absent action by Freddie Mac, the Company would be required to report a large one-time gain effective January 1, 2001, because the fair value of its derivatives portfolio greatly exceeded the book value and, thereafter, it would be required to mark to market certain derivatives, thereby introducing a new component of volatility that complicated the Company's ability to maintain steady and predictable reported earnings.

23.     Consistent with the Company's general policy of reporting steady and predictable earnings growth, the Company reacted to SFAS 133 by setting a goal to minimize the transitional effects of SFAS 133 – i.e., the transition gain - that would be reported effective January 1, 2001. To the extent the amount reported as the transition gain would be reduced, such income would positively affect both GAAP operating income and non-GAAP operating earnings in future periods.

24.     To help implement this policy, in August 2000 Freddie Mac management formed a SFAS 133 working group or "transition team."  Members of that team varied over time, but included, among others defendants, Clarke, Dean, and Dossani.

25.     During the summer of 2000, the SFAS 133 transition team began to calculate and track the Company's projected SFAS 133 transition gain.  When first formally calculated, the team projected a transition gain of approximately $300 million.  By November 2000, the

projected transition gain had risen to around $700 million, and by early December it had reached $1.4 billion.

26.     On November 22, 2000 and December 8, 2000, the transition team held two critical meetings to discuss efforts to reduce the gain. The November 22 meeting primarily concerned the details of, and strategy behind, the "CTUG" transaction discussed in detail below. The December 8 meeting – chaired by defendant Clarke – focused on several alternatives to reduce the rapidly-increasing projected transition gain. To achieve the goal of reducing the transition gain, Freddie Mac completed planning for two sets of previously developed transactions – the "Coupon Trade-Up Giant" transaction and the J Deals. Within a three-week period at the end of 2000, it also altered the method by which it valued its portfolio of "swaptions."

### *The Coupon Trade-Up Giant ("CTUG")Transactions and "J Deals 6 and 7"*

27.     Predominant among the transactions Freddie Mac entered into in its effort to minimize the projected SFAS 133 gain was one referred to as Coupon Trade-Up Giant or "CTUG." The CTUG transactions – which involved transactions in depreciated Participation Certificates whose market value was below book value and which Freddie Mac had classified as "held to maturity" – had little independent business purpose and were structured to reduce the transition gain by taking advantage of the one-time opportunity allowed under SFAS 133 to reclassify securities from "held to maturity" to "available-for-sale" or "trading." Although the CTUG transactions were structured with the concurrence of the Company's auditors, the implementation of the transactions did not comply in all respects with the structure approved by the Company's auditors. These transactions were designed to minimize the SFAS 133 transition

gain, and the failure to disclose them conveyed a false impression of the effect of the Company's adoption of SFAS 133.

28.    GAAP, specifically SFAS 115, requires that mortgage-backed securities be classified as either "held to maturity," "available for sale" or "trading" and it applies different accounting principles and reporting requirements to each classification.   Specifically, such securities classified as "trading" must be marked to market each reporting period with the changes in market value reported in the current period as income or loss, while "held to maturity" securities are reported at historical cost, and "available for sale" securities are reported at market value but the changes in their fair value are recorded as direct increases or decreases in stockholder's equity.

29.    SFAS 133 gave issuers a one-time opportunity to reclassify marketable debt and equity from the "held to maturity" account to "available-for-sale" or "trading."   Under SFAS 133, the effect of adjusting the historical cost of a "held to maturity" security to market value upon its transfer to the "trading" category would be included as an increase or decrease in the SFAS 133 transition gain.

30.    In November and December 2000, Freddie Mac transferred approximately $32.1 billion of the "Participation Certificates" referred to above – securities representing interests in pools of mortgages that permitted the holder to participate in the profits and losses of the pools – from its "held-to-maturity" account to "trading," effective January 1, 2001.   Under SFAS 133, this transfer allowed the Company to recognize a loss of approximately $341 million – the difference between historical book and market value of the Participation Certificates – and thus partially offset the Company's anticipated SFAS 133 transition gain.   Once classified as

"trading," however, the Participation Certificates would need to be marked-to-market each reporting period, starting January 1, 2001, as required by SFAS 133.

31.    In November and December 2000, in an effort to generate further losses that could be offset against the anticipated SFAS 133 transition gain and in an effort to reclassify the Participation Certificates back to the "available for sale" classification so that the securities would not have to be marked-to-market through current income on a going forward basis, the Company also entered into a series of simultaneous forward sales and purchase commitments involving approximately $30 billion of the $32.1 billion in Participation Certificates.

32.    On or about November 30, 2000, but effective as of January 1, 2001, Freddie Mac entered into a forward sale contract to transfer approximately $14 billion of bundled Participation Certificates to a third party on January 1, 2001, and a forward purchase contract under which the third party would resell to Freddie Mac the entire $14 billion of bundled securities as a "Giant" security after first replacing approximately ten percent of the transferred securities with new securities that had similar characteristics.

33.    On or about December 8, 2000, in a separate but similar transaction, Freddie Mac transferred $16 billion in bundled Participation Certificates to the same third party. On or about the same day, the third party in turn "sold" back to Freddie Mac 99.5% of the same bundled securities in another "Giant" security, retaining the remaining 0.5% for its own account.

34.    Freddie Mac accounted for these forward sales contracts as derivatives and, as such, they were marked to market. On January 1, 2001, when the contracts were valued, the price of the contracts was $425 million less than the book value of the Participation Certificates (as a result of a $301 million increase in the value of the Participation Certificates). Freddie Mac reclassified the securities to be delivered from "held to maturity" to "trading," which resulted in

a $425 million loss that reduced the SFAS 133 transition gain. Additionally, the $301 million increase in the value of the Participation Certificates meant that Freddie Mac had "lost" $301 million on its derivative forward, which also served to reduce the SFAS 133 transition gain. Thus, in total, Freddie Mac was able to generate approximately $726 million in "losses" as of January 1, 2001, thereby offsetting much of the SFAS 133 transition gain that the Company had projected as of that date.

35.    Further, upon settlement of the simultaneous forward purchase and sale transactions, Freddie Mac classified the purchased Giant securities as "available for sale." Prior to the forward purchase and sale transaction, the Company had classified the securities in the "trading" category. Since GAAP generally does not permit a company to simply reclassify securities between the "trading," "available for sale" and "held to maturity" classifications without meeting a host of requirements, Freddie Mac had structured the transactions as (i) the sale of a security consisting of numerous individual Participation Certificates to the third party and (ii) the repurchase of several securities of bundled Participation Certificates from that same third party. The Company then reclassified the "new" (though substantially similar) securities to "available for sale," which were not required to be marked-to-market in the income statement each reporting period.

36.    In November and December 2000, in what were known at the Company as "J Deals 6 and 7," Freddie Mac again structured transactions that were used to change the classification of securities in order to reduce the transition gain by seeking to take advantage of the one-time reclassification opportunity allowed under SFAS 133. J Deals 6 and 7, which were also discussed with the Company's auditor, were pre-planned purchase and sale transactions done to "sell" securities that the Company would reclassify from "held to maturity" to "trading,"

with the loss on the reclassification recorded as a reduction of the SFAS 133 transition gain, and then "acquire" essentially the same securities that the Company would classify as "available-for-sale," and thereby prevent the future earnings volatility that would result from SFAS 115's requirement that securities designated as "trading" be marked to market.  Like the CTUG transactions, these two J Deals had principally an accounting purpose, were designed to reduce the transition gain, were not compliant with GAAP, and the failure of the Company to disclose these transactions concealed from investors the true effect of the Company's adoption of SFAS 133.

37.    In J Deals 6 and 7, Freddie Mac entered into transactions in which it sold interest-rate swaps and fixed-rate securities transferred from its "held to maturity" account to its "trading" account to a third party.  Those securities, as planned in advance, were repackaged into larger bundles with no change in the terms of the underlying securities.  The bundled securities were conveyed to two different trusts – the "J006" and "J007" trusts – and Freddie Mac purchased a 90% beneficial interest in the trusts.  In January 2001, upon their purchase, Freddie Mac classified the beneficial interest in the J006 trust as "held-to-maturity" and the beneficial interest in the J007 trust as "available-for-sale."

38.    Through this process of securitization and reclassification, Freddie Mac was able to recognize losses of approximately $9 million on J Deal 6, and approximately $11 million on J Deal 7, which the Company used to reduce its SFAS 133 transition gain.

### The Effect of CTUG and J Deals 6 and 7

39.    Freddie Mac's classification of securities purchased in the CTUG and J Deals 6 and 7 transactions as "available for sale" or "held to maturity" was not permitted by GAAP because the securities purchased were overwhelmingly comprised of the same underlying cash

flows as the securities sold, which had been classified as "trading" prior to their sale. The classifications, thus, were not in accordance with the principles set forth in FASB Staff Implementation Guide to SFAS 125, Answers 59 and 60 and therefore violated GAAP. As a result, Freddie Mac's 2001 Information Statement and Annual Report materially overstated the amount of securities in its "available for sale" account by approximately $22.8 billion (an 11.1% overstatement). Freddie Mac's "trading" account – which then reflected a balance of $0 – was materially understated by a corresponding amount – $22.8 billion.

40.    The improper inclusion of these securities in the "available for sale" and "held to maturity" accounts had a material impact on the Company's reported income for its 2001 and 2002 fiscal years. Changes in the securities' market value were not included in the income statement as they would have been had the securities been properly classified as "trading." This caused the following Company financial reports and public statements to include net income figures that were materially false and misleading:

    a.    The first quarter 2001 ISS, first quarter 2001 Earnings Release, first quarter 2002 ISS, and first quarter 2002 Earnings Release, in which Freddie Mac materially understated first quarter 2001 net income by $76 million, or 8.3%.

    b.    The second quarter 2001 ISS, second quarter 2001 Earnings Release, second quarter 2002 ISS, and second quarter 2002 Earnings Release, in which Freddie Mac materially overstated second quarter 2001 net income by $300 million, or 48.9%.

    c.    The third quarter 2001 ISS, third quarter 2001 Earnings Release, third quarter 2002 ISS, and third quarter 2002 Earnings Release, in which Freddie Mac

materially understated third quarter 2001 net income by $936 million, or 47.6%.

    d.   The fourth quarter 2001 ISS, fourth quarter 2001 Earnings Release, fourth quarter 2002 ISS, and fourth quarter 2002 Earnings Release, in which Freddie Mac materially overstated fourth quarter 2001 net income by $462 million, or 51.2%.

    e.   The 2001 Information Statement, 2001 Annual Report, 2001 Earnings Release, 2002 Information Statement, 2002 Annual Report, and 2002 Earnings Release, in which Freddie Mac materially understated 2001 net income by $250 million, or 5.7%.

    f.   The first quarter 2002 ISS and first quarter 2002 Earnings Release, in which Freddie Mac materially overstated first quarter 2002 net income by $107 million, or 8.2%.

    g.   The second quarter 2002 ISS and second quarter 2002 Earnings Release, in which Freddie Mac materially understated second quarter 2002 net income by $462 million, or 29.4%.

    h.   The third quarter 2002 ISS and third quarter 2002 Earnings Release, in which Freddie Mac materially understated third quarter 2002 net income by $243 million, or 15.0%.

41.    Freddie Mac violated GAAP when it accounted for the CTUG transactions and J Deals 6 and 7.  While Freddie Mac personnel responsible for determining the Company's accounting for these transactions actively discussed the CTUG transactions and J Deals within the organization and with the Company's outside auditors, they knew such transactions were

designed to reduce the transition gain, and did not ensure the transactions were implemented in accordance with the structures approved by the Company's auditors. In the course of performing their assigned duties, such personnel were negligent and either ignored or failed to adequately consider the guidance of SFAS 125, Answers 59 and 60, and the effect that guidance would have on the accounting for the CTUG and J Deal 6 and 7 transactions. The Company also failed to maintain personnel with adequate accounting expertise to assure that the transactions were properly accounted for under GAAP.

### *Changes In The Methodology For Valuing Swaptions*

42.    As described above, by early December 2000, Freddie Mac's estimate of its SFAS 133 transition gain had risen from approximately $700 million to approximately $1.4 billion. Thus, as the SFAS 133 implementation date drew near, defendants Clarke, Dean and Dossani, and others, knew that the CTUG and J Deal 6 and 7 transactions would not entirely eliminate the transition gain.

43.    The increase in the Company's estimated SFAS 133 transition gain was primarily due to a steady increase in the current and projected value of Freddie Mac's portfolio of "swaptions" – options to enter into interest-rate swap agreements – as Freddie Mac's 2000 fiscal year drew to a close. The Company carried a large portfolio of swaptions, which it used in part to hedge the prepayment risk embedded in mortgages in its portfolio. A "swaption" is a derivative subject to the new mark-to-market requirements of SFAS 133. Accordingly, on January 1, 2001, Freddie Mac would be required to report as part of its transition gain the difference between the fair value and historical cost of its swaptions, including any increases in the value of those swaptions that occurred in late 2000.

44.     Under SFAS 133, if a market price for a derivative is not available, the derivative can be valued using pricing models that employ market-based variables.  Swaptions are valued using pricing models.  A critical variable in pricing or valuing swaptions is the expected volatility of the interest rates on which the underlying instruments are based.  Everything else being equal, an increase in the expected or implied volatility of the interest rates would lead to an increase in the price or value of the corresponding swaption.  Participants in the market for swaptions frequently use the terms "price" and "volatility" interchangeably, as the two generally move in tandem.  The price of a given swaption can be inferred from its volatility, and vice versa, through the use of option pricing models.  Thus, as reported "prices" for swaptions increased through November and December 2000, their reported "implied volatilities" also increased.

45.     In response to these developments in the swaptions market, Freddie Mac's SFAS 133 transition team (including defendants Clarke, Dean and Dossani) and other senior officials met to discuss the rising projected transition gain and to consider alternative methods to lower the gain.

46.     Historically, Freddie Mac had calculated the value of its swaptions portfolio using current market implied volatilities provided by a third-party swaptions pricing provider (hereinafter "Independent Swaptions Pricing Service").

47.     As of December 8, 2000, no one at Freddie Mac had suggested that Freddie Mac's historical method would result in an inaccurate fair value for the Company's swaptions portfolio.

48.     On December 12, 2000, after brainstorming alternative ways to reduce the transition gain, defendant Dean suggested that the Company could record a lower valuation – and thus reduce its transition gain – if the current market implied volatilities reported by the

Independent Swaptions Pricing Service were not an accurate reflection of the price at which the Company could trade swaptions.

49.     Beginning on or about December 22, 2000, in a series of memoranda written by or in consultation with defendant Dean and others, the Company undertook to revise its methodology for valuing its swaptions portfolio, incorporating the unproven premise that prevailing market prices were not indicative of where the Company could conduct transactions in the swaptions market.  Defendant Dossani received and/or reviewed copies of at least some of the series of memoranda and discussed the proposed methodology with its authors and the Company's independent auditors.

50.     On January 2, 2001, the Company formally adopted a revised methodology for valuing swaptions.  The new methodology – which the Company used to calculate the fair value that was reported in its year-end financial statements – used volatility values from November 20, 2000, a date six weeks prior to January 1, 2001.  This resulted in the Company's swaptions portfolio being valued approximately $731 million less than it would have been had the Company used current market implied volatilities, i.e, values from December 29, 2000, the last business day of the year.

51.     The Company premised its use of November 20 pricing data on (i) the market for swaptions purportedly being illiquid as of December 29, 2000 to a degree seen only during certain historic events, and (ii) the Company purportedly being unable to transact business in swaptions at prices derived through implied volatility reported in the then-current market.

52.     Defendant Dean and others developed a test to support the illiquidity premise. The test involved retroactively comparing the daily percentage changes in implied volatility levels of swaptions to their five-year historical standard deviation, or differences from mean

values.  The stated purpose of this test was to show that the frequency and magnitude of changes in implied volatilities during November and December 2000 were unprecedented versus other prior market liquidity crises.  When the critical standard deviation parameter of this test failed to "prove" the requisite historic market illiquidity at three standard deviations, the test was altered until it showed the swaptions market was at historically illiquid levels.  The final test used two standard deviations.

53.     Defendant Dean initiated the concept and significantly contributed to the development of the Company's revised methodology for calculating the fair value of its swaptions portfolio.  It was formally approved by defendants Dean and Dossani, and another more senior F&I officer.  Defendant Clarke was informed of the change in methodology and it was adopted in the preparation of the Company's year-end financial statements.

54.     The changed valuation method enabled Freddie Mac to value its swaptions at a value approximately $731 million lower than it would have been if current market implied volatilities (i.e., December 29, 2000 volatilities) had been used, thus offsetting approximately $731 million of the SFAS 133 transition gain and causing the following reported financial metrics to be materially misstated in Freddie Mac's Information Statement and Annual Report for 2000, which was signed by, among others, defendant Clarke:

      a.   "Futures and Options" in Table 10 were valued at $2.008 billion; the value using year-end volatilities (the historically utilized method) was $2.739 billion – a 26.7% understatement.

      b.   "Total—Net Fair Value" of derivatives in the same table was negative $257 million; this figure should have been $474 million.

c.  "Gross Positive Fair Value" of Futures and Options in Table 9-3 in the notes to the financial statements shows a value of $2.187 billion; using year-end volatilities, it would have been $2.918 billion – a 25.1% understatement.

d.  The "Gross Positive Fair Value" of Freddie Mac's derivatives portfolio in the same table was $6.312 billion; using year-end volatilities, it would have been $7.033 billion – a 10.4% understatement.

55.    Defendants Clarke and Dossani should have known that these financial metrics were materially misstated.  Defendants Dean and Dossani formally approved the use of the methodology that resulted in the swaptions valuation being materially understated, despite their knowledge of certain facts that should have called into question the validity of the methodology and its suitability for determining the fair value of the Company's swaptions.

56.    The swaption values described above, in addition to being used to calculate the transition gain that would be reported on January 1, 2001, were used to develop the disclosures required by SFAS 107 in connection with the Company's 2000 Information Statement.  By reporting materially understated values for its swaptions at year end 2000, Freddie Mac violated SFAS 107.  Among other relevant parts, SFAS 107 paragraph 10 required that the Company disclose the fair value of financial instruments for which is it practicable to estimate the value. The swaptions were such instruments, and should have been disclosed in the Company's 2000 Information Statement and Annual Report notes to the financial statements at their "fair value" on the balance sheet date.  The swaptions were not disclosed at their fair value.

57.    Freddie Mac used the November 20, 2000 volatilities to value its swaptions portfolio at year-end in circumstances where:

a.  Freddie Mac had asked the Company's Independent Swaptions Pricing Service to calculate the value of the Company's swaptions portfolio using November 20, 2000 volatilities before the decision to adopt the revised methodology had been reached.

b.  Defendants Dean and Dossani knew that the Independent Swaptions Pricing Service did not provide Freddie Mac with swaptions values using historical volatilities in the normal course of business.  Defendant Dean knew the Company had not previously deviated from the use of current market implied volatilities, but rather, the Company generally used for its swaptions valuation model current end-of-day market inputs from the Independent Swaptions Pricing Service.

c.  Defendant Dean was not aware of any company that had ever used historical data to price a portfolio of swaptions.

d.  Defendants Dean and Dossani knew that the Independent Swaptions Pricing Service had published data regarding the value of Freddie Mac's swaptions portfolio as of December 31, 2000.  That data included a figure representing the value of Freddie Mac's entire portfolio, as well as of individual swaptions, and was readily accessible.

e.  Defendant Dean knew the current market implied volatilities data provided by the Independent Swaptions Pricing Service was used by Freddie Mac personnel in the Company's risk management practices and activities throughout the period whereas the revised methodology was used for accounting purposes.

f.   Freddie Mac maintained a survey of current prices at which dealers were willing to transact significant swaptions business.  That survey contained dealer price quotes through at least December 19, 2000, and represented the price at which dealers were willing to trade for up to at least a $100 million notional amount.  The survey was inconsistent with the theory that Freddie Mac could not transact business at prices consistent with current market implied volatilities in December 2000.

g.   Defendant Dossani did not contemporaneously communicate to the Investment Committee of the Company's Board of Directors in December 2000 any concerns about liquidity in the swaptions market – the critical factor in the Company's decision to deviate from current market implied volatilities in valuing its swaptions at year-end.

h.   Defendants Dean and Dossani approved the discontinuation of the revised swaption valuation methodology within weeks of its adoption.  The Company's historical methodology for calculating the value of its swaptions portfolio was reinstated effective February 5, 2001.

i.   Defendants Clarke, Dean and Dossani should have known that the values derived from the November 20th implied volatilities improperly reduced the Company's reported transition gain and therefore did not result in the swaptions being reported at a reasonable estimate of their fair value at year-end as required by GAAP.

j.   Defendants Dean and Dossani should have known that the circumstances surrounding the development of the valuation methodology created substantial risk that the swaptions would not be disclosed at their fair value on the balance sheet date as required by GAAP.

k.   Defendants Dean and Dossani failed to inquire as to whether there was any academic or empirical research supporting the use of historical volatilities in connection with determining fair value, or whether any other companies had used historical volatilities under similar circumstances.

l.   Defendants Dean and Dossani failed to ensure that sufficient action was taken to determine the prices at which Freddie Mac could have actually transacted business in swaptions at year-end.

58.   In the "Valuation Methods & Assumptions" section of its 2000 Information Statement and Annual Report, Freddie Mac failed to disclose the method (the procedure purporting to determine whether values assigned to swaptions are consistent with levels at which Freddie Mac could transact in the market) and a significant assumption (the use of November 20, 2000 volatilities) used to arrive at the "fair value" of Freddie Mac's swaptions portfolio. Moreover, the Company also failed to disclose the significance of the method and assumption upon the financial statements at year-end 2000, which was to reduce the reported values of the swaptions portfolio from $2.739 billion, the value using year-end volatilities, to $2.008 billion, the reported value using November 20, 2000 volatilities – an understatement of 26.7%.  By failing to do so, the Company knowingly or recklessly did not comply with the requirements of SFAS 107 and thereby violated GAAP.

59.    In its 2000 Information Statement and 2000 Annual Report, Freddie Mac stated that "Freddie Mac estimates the fair value of derivative financial instruments using discounted cash flow models based on current market interest rates and estimates of interest-rate volatility." This language was materially false and misleading because it omitted to state that the Company had significantly changed the method it used to value its swaptions, and because it gave the reader the false impression that Freddie Mac had used "current" and thus year-end interest rates and volatilities to value its swaptions portfolio – a subset of its "derivative financial instruments" – when the Company, in fact, used volatilities from November 20, 2000.

60.    The Company had a process in place for developing its public disclosures, and defendant Clarke had approval authority for all aspects of financial disclosure according to Freddie Mac policy.  Defendant Clarke failed to ensure that the disclosures in Paragraphs 54, 56, and 58-59, above, were appropriate, adequate and not misleading.

61.    In each of its Information Statements, ISSs, and Earnings Releases, beginning in the first quarter of 2001 through the third quarter of 2002, Freddie Mac reported a line-item entitled, "Cumulative effect of change in accounting principle, net of taxes."  In each of these reports, Freddie Mac reported the value of the line item as $5 million.

62.    Freddie Mac materially understated this line item because of its noncompliance with GAAP in connection with the altered swaptions valuation method.  Had the Company reported the value of its swaptions and accounted for the CTUG transaction in accordance with GAAP, this line item would have been at least $731 million higher.

### Disclosures Relating to the SFAS 133 Transition
### And The Company's Smoothing of Earnings Through CTUG, J Deals and Swaptions Revaluations

63.    Defendant Freddie Mac knew or was reckless in not knowing that, without the CTUG and J Deal transactions and the change in methodology for valuing swaptions, the

Company would have recognized a transition gain of approximately $1.4 billion. By entering into these transactions, and through its related public disclosures, Freddie Mac failed to adequately inform investors of the true impact of the adoption of SFAS 133.

64.     In its fourth quarter 2000 ISS and 2000 Information Statement, Freddie Mac claimed that, "Management anticipates that the adoption of SFAS 133 may increase (perhaps materially) the volatility of both 'Net Income' and 'Total Stockholders' Equity' in future periods."

65.     This statement was materially false and misleading because it omitted to state that the Company had actually taken intentional steps to *reduce* volatility in those two metrics by entering into the CTUG and J Deals 6 and 7.

66.     In its fourth quarter 2000 ISS, Freddie Mac stated that it, "currently expects that the net cumulative after-tax adjustment required by SFAS 133 will increase 'Net Income' by approximately $10 million to $20 million. Additionally, the mark-to-market adjustment related to certain derivatives … will decrease 'Total Shareholders Equity' by approximately $2.5 billion."

67.     These statements were materially false and misleading because they omitted to state that those numerical figures would have been materially higher if not for the Company's change in method for valuing the swaptions, and entering into the CTUG and J Deal 6 and 7 transactions, each of which was undertaken for the predominant purpose of reducing the adjustment to net income and total shareholders equity that would otherwise have been precipitated by the adoption of SFAS 133.

68.     In its 2000 Information Statement, Freddie Mac stated that, "the one-time cumulative after-tax adjustments required by SFAS 133 will affect 'Net Income' by no more

than $25 million, and decrease the AOCI component of 'Total Shareholders Equity' by approximately $2.5 billion."

69.     These claims were materially false and misleading because they omitted to state that those numerical figures would have been materially higher if not for the Company's change in method for valuing its swaptions portfolio, and entering into the CTUG and J Deal 6 and 7 transactions, each of which were undertaken for the predominant purpose of reducing the adjustment to net income and total shareholders equity that would otherwise have been precipitated by the adoption of SFAS 133.

70.     In its 2000 Information Statement and Annual Report, Freddie Mac reported net income that had grown at a consistent rate over the past five years.  The Company also commented on its earnings growth, asserting, for example, that, "Over the long term, Freddie Mac has consistently produced high-quality earnings growth."  In doing so, Freddie Mac omitted to state the material facts that: (1)  the Company had undertaken certain of the following transactions, practices, and adjustments for the purpose of reducing its earnings volatility; and (2) that the Company's financial results in subsequent reporting periods could be materially affected by the smoothed earnings resulting from the following transactions, practices, and adjustments:

      a.   Using November 20, 2000 volatilities to value the swaptions; and

      b.   Entering into the CTUG and J Deal 6 and 7 transactions.

### *Misuse of the "FAS 91 Reserve"*

71.     In 1994 Freddie Mac created what the Company termed a "FAS 91 Reserve," which the Company used thereafter to account for changes in the rate at which loan origination costs and fees, premiums and discounts on acquired loans, and fees received for guaranteeing

loans were amortized.  Freddie Mac used the FAS 91 Reserve for improper purposes from at least 1998 through 2002.

72.    Specifically, from at least 1998 through 2002, Freddie Mac improperly recorded as a change to the FAS 91 Reserve the change in accumulated amortization of premiums, discounts and deferred fees resulting from the difference between (i) estimated prepayments of principal on its portfolio of mortgage-backed securities and (ii) actual prepayments of principal. The difference should have been recorded to the Company's income statement as required by SFAS 91.  By charging the FAS 91 Reserve, instead of the Company's income statement, Freddie Mac was able to avoid recording income or expense in the appropriate period.  This assisted the Company in its efforts to report smooth and predictable earnings growth.

73.    As a result of this improper accounting, Freddie Mac materially misstated its net income in the first and second quarters of 1999, the full year 1999, the fourth quarter of 2000, and the first quarter of 2001, as follows:

      a.    The first quarter 1999 ISS, first quarter 1999 Earnings Release, first quarter 2000 ISS, and first quarter 2000 Earnings Release, in which Freddie Mac materially understated its first quarter 1999 net income by $50 million, or 9.72%.

      b.    The second quarter 1999 ISS, second quarter 1999 Earnings Release, second quarter 2000 ISS, and second quarter 2000 Earnings Release, in which Freddie Mac materially understated its second quarter 1999 net income by $59 million, or 10.68%.

      c.    The 1999 Information Statement, 1999 Annual Report, 1999 Earnings Release, fourth quarter 2000 ISS, 2000 Information Statement, 2000 Annual

Report, and 2000 Earnings Release, in which Freddie Mac materially understated its 1999 net income by $133 million, or 6.0%.

d.  The fourth quarter 2000 ISS, first quarter 2001 Earnings Release, and fourth quarter 2001 Earnings Release, in which Freddie Mac materially overstated its fourth quarter 2000 net income by $39 million, or 5.85%.

e.  The first quarter 2001 ISS, first quarter 2001 Earnings Release, first quarter 2002 ISS, and first quarter 2002 Earnings Release, in which Freddie Mac materially overstated its first quarter 2001 net income by $79 million, or 9.44%.

74.    Freddie Mac personnel who contributed to the Company's use of this reserve acted within the scope of their authority, in accordance with company policy, and in furtherance of the Company's goal of maintaining smooth and predictable earnings growth.

75.    Freddie Mac also violated GAAP in connection with its calculation of SFAS 91 amortization in the first and second quarters of 2002.  In those quarters, for the purpose of affecting reported earnings, Freddie Mac improperly substituted a flat, or static, yield curve for the 60-month forward yield curve previously used in the model it used to estimate prepayments in calculating the FAS 91 amortization.  Alteration of this important input to the model did not represent a reasonable estimate of the probable future principal prepayments.

76.    As a consequence of this improper substitution, Freddie Mac, in its first quarter 2002 ISS and first quarter 2002 Earnings Release, materially understated its first quarter 2002 net income by $90 million, or 5.8% and, in its second quarter 2002 ISS and second quarter 2002 Earnings Release, overstated its second quarter 2002 net income by $90 million, or 9.3%.

77.    Freddie Mac's 2000 Information Statement and Annual Report omitted to state the material facts that: (1)  the Company had undertaken the following transactions, practices, and adjustments – each of which had principally an accounting purpose – for the purpose of reducing its earnings volatility; and (2) that the Company's financial results in subsequent reporting periods could be materially affected by the artificially smoothed earnings resulting from the transactions, practices, and adjustments so that the "high quality earnings growth" was, in fact, managed earnings:

      a.    Using the improper FAS 91 Reserve to account for amortization of premiums, discounts and deferred fees; and

      b.    Making "on-top" discretionary adjustments to the Company's FAS 91, legal, and tax reserves prior to reporting its periodic financial results.

### *The "Linked Swap" Transactions*

78.    In August and September 2001, Freddie Mac designed and executed a series of nine paired swap transactions with various counter-parties, the total face (or notional) value of which was approximately $180 billion.  These transactions, one of which, as described below, was leveraged at a ratio of 5 to 1, came to be known within the Company as the "linked swaps."

79.    The linked swap transactions  – executed by the Company between August 14 and September 7, 2001 – operated to offset "pay-fixed interest rate" swaps (which obligated Freddie Mac to make a payment to the counter-party based on a fixed rate) against "receive-fixed interest rate" swaps (which obligated the same counter-party to make a payment to Freddie Mac based on a fixed rate).  Each linked pair of swaps had the same maturity date and notional amounts; however, the "effective dates" differed such (a) that the interest on each pay-fixed swap (i.e. the interest Freddie Mac was obligated to pay) began to accrue immediately, whereas, (b) the interest

on the "linked" receive-fixed swap (i.e. the interest the counter-party was obligated to pay) did

not begin to accrue until at least 31 to 273 days later.

80.     The pay-fixed transactions worked as follows:

| Trade Date | Maturity Date | Notional Amount | Counter-Party | Date Interest Began to Accrue |
|---|---|---|---|---|
| 8/14/01 | 2/19/05 | $ 5 billion | Morgan Stanley | 8/16/2001 |
| 8/15/01 | 9/19/06 | $ 5 billion | UBS Warburg | 8/17/2001 |
| 8/16/01 | 8/20/05 | $ 5 billion | Lehman Bros. | 8/20/2001 |
| 8/17/01 | 8/21/06 | $ 5 billion | Merrill Lynch | 8/21/2001 |
| 8/20/01 | 8/22/06 | $ 5 billion | Goldman Sachs | 8/22/2001 |
| 8/22/01 | 8/24/06 | $ 5 billion | UBS Warburg | 8/24/2001 |
| 8/23/01 | 8/27/04 | $ 5 billion | Merrill Lynch | 8/27/2001 |
| 8/27/01 | 8/29/04 | $ 5 billion | UBS Warburg | 8/29/2001 |
| 9/7/01 | 9/11/06 | $ 50 billion ($ 10 billion leveraged at a ratio of 5:1) | Goldman Sachs | 9/11/2001 |

81.     The receive fixed transactions worked as follows:

| Trade Date | Maturity Date | Face Amount/ Notional Amount | Counter-Party | Date Interest Began to Accrue |
|---|---|---|---|---|
| 8/14/01 | 2/19/05 | $5 billion | Morgan Stanley | 2/19/2002 |
| 8/15/01 | 9/19/06 | $5 billion | UBS Warburg | 3/19/2002 |
| 8/16/01 | 8/20/05 | $5 billion | Lehman Bros. | 2/20/2002 |
| 8/17/01 | 8/21/06 | $5 billion | Merrill Lynch | 2/21/2002 |
| 8/20/01 | 8/22/06 | $5 billion | Goldman Sachs | 11/22/2001 |
| 8/22/01 | 8/24/06 | $5 billion | UBS Warburg | 9/24/2001 |
| 8/23/01 | 8/27/04 | $5 billion | Merrill Lynch | 9/27/2001 |
| 8/27/01 | 8/29/04 | $5 billion | UBS Warburg | 5/29/2002 |
| 9/7/01 | 9/11/06 | $50 billion ($10 billion leveraged at a ratio of 5:1) | Goldman Sachs | 12/11/2001 |

82.     The net effect of these linked swap transactions, from an accounting standpoint,

was the immediate recognition of interest expense by Freddie Mac in the initial periods, with the

recognition of interest income by Freddie Mac in future periods. Conceptually, these transactions were similar to advancing the counterparties money the Company was earning from its operations, that otherwise would be reported in its financial statements, in return for which the Company would receive money from the counterparties at a later time.

83.    The linked swap transactions had little independent business purpose and were done for the principal purpose of reducing the Company's "operating earnings" (a non-GAAP metric and *pro forma* presentation done outside of the normal financials) for 2001, and moving such earnings to 2002 and beyond. Although the linked swaps essentially offset each other, Freddie Mac accounted for each swap as a separate derivative contract which was to be marked-to-market under SFAS 133 each reporting period. As a result, in the initial months, Freddie Mac would report a reduction in its operating earnings due to its accrual of interest expense on the pay-fixed swaps, while in later periods operating earnings would be increased due to its accrual of interest income on the receive-fixed swaps.

84.    Specifically, beginning in the spring of 2001, the Company recognized that its net interest income – and, hence, its anticipated operating earnings for 2001 – exceeded internal projections. This increase was attributable to, among other things, an unforeseen steepening of the interest rate yield curve. Defendants Glenn and Clarke were aware of this as early as April 2001 because of their attendance at Asset/Liability Management Forums.

85.    Defendants Glenn and Clarke knew or should have known no later than August 7, 2001, while attending an Asset/Liability Management Forum, that the Company's projected earnings per share for 2001 was 89 cents over plan. Certain attendees of that meeting expressed concern that such earnings would raise the bar for future years in terms of meeting earnings expectations.

86.     At the Asset/Liability Management Forum on August 7, 2001, participants discussed having Freddie Mac's Funding & Investments Division ("F&I") develop a strategy to reduce the projected current period excess net interest income as part of "managing the trade-offs between achieving current period earnings, managing risks and meeting future period earnings expectations."

87.     F&I conceived of and executed the linked swap transactions within this framework. The linked swap transactions resulted in Freddie Mac shifting approximately $456 million of operating earnings from 2001 to later periods.

88.     Defendants Glenn and Clarke learned in September 2001, after the linked swap transactions had been executed, that projected net interest income was only 23 cents over plan, whereas, in August 2001, projected net interest income had been 89 cents over plan. This reduction was not explainable by organic business activities. Handouts prepared for a September 2001 Market Risk Oversight forum, which did not occur as scheduled, specifically stated that the Company was using swaps to transfer net interest income (and thus earnings) to 2002 and beyond.

89.     In late September 2001 and in various meetings in October 2001, the Company's external auditor expressed to defendants Glenn and Clarke and others at the Company a concern about the linked swap transactions. The principal concern expressed by the auditor was that the transactions had a material effect on the Company's reported net operating earnings and did not appear to be consistent with prior transactions in terms of their effect on the Company's asset liability management efforts. The auditor also expressed a concern that accounting for each side of the linked swaps as a separate transaction might be improper. The auditor told defendants

Glenn and Clarke, and others, that his preference would be for Freddie Mac to close out the positions and not engage in similar transactions in the future.

### *Linked Swaps – GAAP Violations*

90.     In its 2001 Information Statement and Annual Report, Freddie Mac, by accounting for the paired linked swap transactions as separate derivative instruments, knowingly or recklessly presented financial statements that did not comply with GAAP.  SFAS 133, Derivatives Implementation Group Issues K1, F6, and A11 required that each pair of linked swaps be accounted for as a single unit based on at least: (1) the fact that each pair was executed with the same counterparty as part of a single transaction; and (2) that the accounting effect of the transactions far outweighed their risk management or other business effect.

91.     As a result of this failure to comply with GAAP, in accounting for the linked swaps, Freddie Mac materially understated its 2001 net income – as reported in its 2001 Information Statement and Earnings Release – by $422 million, or 9.2%.  In the course of performing their assigned duties, personnel responsible for determining the Company's accounting for the linked swap transactions knowingly or recklessly failed to consider the guidance of SFAS 133, Derivatives Implementation Group Issues K1, F6, and A11, the effect that guidance would have on the accounting for the linked swap transactions, and whether or not each paired transaction should have been accounted for as a combined derivative.  Moreover, the Company failed to maintain personnel with adequate accounting expertise to assure that the transactions were properly accounted for under GAAP.

### *Failure to Disclose Linked Swaps and their Effect on Current and Future Operating Earnings*

92.     In its discussion of operating earnings in several of its financial reports and public statements, Freddie Mac knowingly or recklessly failed to disclose that its reported operating

earnings figure had been materially reduced by the linked swap transactions, which intentionally shifted a material amount of operating earnings from the reported periods into future periods, and that it expected the Company's operating earnings in subsequent reporting periods to be materially affected by this shift.

93.    The following Company financial reports contained materially false and misleading operating earnings figures as a result of the linked swap transactions:

     a.    The third quarter 2001 ISS and Earnings Release failed to disclose that $130 million, or 16% of the total for the period, had been shifted from the third quarter of 2001 to later periods.

     b.    The fourth quarter 2001 ISS and 2001 Earnings Release failed to disclose that $326 million, or 38.2% of the total for the period, had been shifted from the fourth quarter of 2001 to later periods.

     c.    The 2001 Information Statement, 2001 Annual Report and 2001 Earnings Release failed to disclose that $456 million, or 14.6% of the total for the period, had been shifted to later periods.

     d.    The first quarter 2002 ISS and Earnings Release failed to disclose that $148 million, or 16.6% of the total for the period, had been shifted to later periods.

94.    In its 2001 Information Statement, dated March 29, 2002, the Company did not disclose to the investing public that it had entered into the linked swap transactions or that, as a result, it had understated its true operating earnings. This nondisclosure was materially false and misleading in that it omitted to state that Freddie Mac had entered into the linked swap derivative transactions that shifted $456 million out of operating earnings for the third and fourth quarters

of 2001 – 27.4% of the total for those periods.  Defendant Clarke, among others, signed the Company's 2001 Information Statement.

95.     Additionally, in its third quarter 2001 ISS, fourth quarter 2001 ISS, and 2001 Information Statement, Freddie Mac asserted that, "Management believes that results presented on an operating basis … are beneficial in understanding and analyzing Freddie Mac's financial performance because they better reflect the economic impact of Freddie Mac's risk management activities."

96.     These statements were materially false and misleading because Freddie had intentionally skewed its reported operating earnings by the use of the linked swaps, yet touted the operating earnings metric as the most beneficial to investors.  Moreover, they omitted to state that Freddie Mac had intentionally shifted a material amount of operating earnings from the third and fourth quarters of 2001 to later periods and that the Company's operating earnings in subsequent reporting periods could be materially affected by this shift.  Operating earnings for the third and fourth quarters of 2001 totaled $1.666 billion; accordingly, the approximately $456 million in operating earnings shifted out of those periods by the linked swaps was approximately 27.4% of the total.

97.     When the Company addressed the effects derivatives could have on its financial results, it did not mention operating earnings as a metric that could be affected, and when it addressed operating earnings, it did not mention the potentially distorting effects of derivative transactions.

98.     Additionally, Freddie Mac earnings releases for these periods included the following materially misleading statements, which stressed the quality and consistency of the Company's operating earnings performance:

a.  On October 17, 2001, Freddie Mac issued its third quarter 2001 Earnings Release, encaptioned: "Freddie Mac Announced Record Earnings For Third Quarter 2001: Third Quarter 2001 Operating Earnings Per Share Up 26 Percent."  The Company represented that its operating earnings had increased 26% over third quarter 2000.

b.  In that release, the Company also informed the investing public that "Freddie Mac again proved to be a rock of stability" and it projected that, despite post-September 11th uncertainty in the economy, "Freddie Mac is well positioned to produce mid-teens earnings growth in 2002."  Defendant Glenn represented that the 26% growth in operating earning was the result of "[e]xcellent portfolio and revenue growth combined with stellar credit performance."  There was no mention of the linked swap transactions or the effect that such transactions had on operating earnings for the quarter or would have on a going forward basis, including the impact it would have on the Company's ability to produce mid-teens earnings growth.

c.  On January 22, 2002, Freddie Mac issued its year-end 2001 Earnings Release, encaptioned "Freddie Mac Announces Record Earnings For 2001: 2001 Operating Earnings Per Share Up 24 Percent." – The Company represented that its operating earnings had increased 24% over 2000.  It projected that, in 2002, its operating earnings growth would be in the "mid-teens" due to continued growth in the mortgage market, and "excellent prospects in the retained portfolio and securitization businesses."

d.  In that release, the Company also informed the investing public that, "2001 was another terrific year for Freddie Mac.… [The Company] achieved 24 percent operating earnings per share growth.… The [Company's] return on equity exceeded 20 percent for the 20th year in a row. We ended the year with rock-solid financial strength, well protected from economic volatility and positioned to produce mid-teens earnings growth in 2002." Defendant Glenn attributed the Company's performance to "[r]ecord portfolio growth, strong revenue gains and continued low credit costs…." Yet again there was no mention of the linked swap transactions or the effect that such transactions had on operating earnings for the year or the role such transactions would have in enabling the Company to meet its 2002 projections.

e.  On April 23, 2002, Freddie Mac issued its first quarter 2002 Earnings Release, encaptioned: "Freddie Mac Announces Record Earnings For First Quarter 2002: First Quarter 2002 Operating Earnings Per Share Up 24 Percent." The Company represented that its 1st quarter 2002 operating earnings were 24% higher than 1st quarter 2001. The Company also stated that it expected operating earnings growth for 2002 to be in the 16% to 18% range.

f.  In that release, the Company also informed the investing public that "Freddie Mac delivered outstanding first quarter results, with 24 percent operating earnings growth…." It assured the public that "[i]nvestors can continue to have confidence in the safety, soundness, and transparency of Freddie Mac. Our recent disclosure enhancements raise the already high standard of information we provide." Defendant Glenn stated in the same release that,

"Recent portfolio growth, strong revenue gains and continued low credit costs

contributed to our excellent first quarter performance."

Based on the information known or available to him at the time, defendant Glenn should have

known that his foregoing statements were materially false and misleading statements as they did

not disclose the impact of the linked swap transactions.

99.    Defendant Clarke also made statements in calls with market analysts between

October 2001 and the end of 2002 that further amplified this misimpression.  In those calls,

defendant Clarke touted the Company's operating earnings performance and the usefulness of

the operating earnings metric as a measure of performance, while omitting to state the material

fact that the linked swap transactions had intentionally shifted a material amount of operating

earnings.  For example, on or about October 17, 2001, in a conference call concerning Freddie

Mac's third quarter earnings, defendant Clarke touted performance on an operating earnings per

share basis and stated that portfolio growth during this period occurred "while adhering to our

disciplined investment management framework," but omitted to disclose the linked swap

transactions and their effect on operating earnings.  On or about January 22, 2002, in a fourth-

quarter earnings conference call, defendant Clarke again touted performance on an operating

earnings per share basis and failed to disclose the effect of the linked swap transactions on that

metric.  Defendant Clarke made similar omissions in operating earnings discussions in each of

the four 2002 quarterly earnings conference calls.

### *"J Deals 8 and 9"*

100.    In what were known at the Company as "J Deals 8 and 9," Freddie Mac, in the

first quarter of 2001, bundled – or "resecuritized" – groups of interest-only and principal-only

securities which, in turn, it contributed to two "Swap Trusts" – the "J008" and "J009" trusts.

The resecuritized assets all came from Freddie Mac's available-for-sale portfolio. The J008 trust received resecuritized assets in three different classes – A, B, and C. Classes A and B constituted 99% of the principal amount of the J008 trust. Freddie Mac retained ownership of all Class A and B securities. Class C securities, constituting one percent of the principal amount of the J008 trust, were sold to a third-party investor. The J009 trust was comprised of five classes, each of which, after the trusts' formation, was entirely owned by Freddie Mac.

101.     Freddie Mac constructed J Deals 8 and 9 for the purpose of reducing the volatility in earnings resulting from adoption of the accounting pronouncement known as Emerging Issues Task Force Issue 99-20 ("EITF 99-20"), which, upon its adoption, would have required Freddie Mac to account for its interest-only securities and similar assets – the type of assets transferred to the J008 and J009 trusts – to be accounted for at the lower-of-cost-or-market which meant, effectively, that Freddie Mac would have to write down the value of those assets immediately, as opposed to over time, which in turn would complicate the Company's ability to report smooth and predictable earnings.

102.     At the time the Company entered into J Deals 8 and 9, its portfolio of interest-only securities was valued at approximately $10 billion. The effect of J Deals 8 and 9 was to eliminate a would-be loss of $226 million on the securities transferred to the J008 and J009 trusts. Under the provisions of EITF 99-20, Freddie Mac, had it not entered into J Deals 8 and 9, would have recognized this loss in the second quarter of 2001.

103.     In its ISS for the second quarter of 2001 announcing its results of operations, Freddie Mac omitted to state that it had entered into J Deals 8 and 9 for this purpose. Two quarters earlier, in its 2000 Information Statement, Freddie Mac had stated that, "Management does not expect the implementation of [EITF 99-20] to materially affect the corporation's

reported results of operations and financial position." This statement was materially false and misleading because Freddie Mac entered into J Deals 8 and 9 in order to reduce the volatility of earnings and mitigate the impact of EITF 99-20.

### *Maintenance of Improper Loan Loss Reserves*

104.    Beginning in the first quarter of 1998, and continuing in each period until the second quarter of 2002, Freddie Mac maintained and reported reserves for losses on loans materially in excess of probable losses, in violation of SFAS 5, which required, in each reporting period, that the degree of probability of loss be determined, and that the better estimate within a range be accrued on Freddie Mac's income statement. The Company maintained a loan loss reserve balance that exceeded any amount that could reasonably be characterized as probable, and at times at a level that exceeded even the Company's estimated "realistic worst case," a term used by the Company to denote the high end of the range of reserve figures generated by its loan loss reserve model.

105.    For much of this time period, senior Company officials knew, or were reckless or negligent in not knowing, that the Company's loan loss reserve levels did not conform to GAAP. The nonconforming model that generated the improper reserve levels was used by the Company from the second quarter of 1999 through the second quarter of 2002. All Freddie Mac personnel who contributed to the reporting of the Company's loan loss reserve acted within the scope of their authority and in accordance with Company policy.

106.    The Company's materially overstated reserves unfolded in two phases – one from the second quarter of 1998 through the first quarter of 1999, in which Freddie's reserve levels materially exceeded the Company's estimated "realistic worst case," and from the second quarter of 1999, when Freddie Mac altered its loan loss reserve model to incorporate assumptions

management realized were unrealistic, to the second quarter of 2002, the last quarter before the Company wrote down the reserve by approximately $250 million.

107.    During the later phase, Freddie's loan loss reserves materially exceeded the "Freddie Mac Standard" level, which represented Freddie's best estimate of loan losses.

108.    The specific figures for the overstatements during the first phase were as follows. Quarterly figures were reported on the Company's ISSs, and year-end figures on its Information Statements and Annual Reports.  Freddie Mac knew, or was reckless or negligent in not knowing, that these figures materially deviated from GAAP:

   a.  In the second quarter of 1998, Freddie Mac's reported loan loss reserve balance was $720 million – 51.6% higher than the realistic worst case of $475 million.

   b.  In the third quarter of 1998 the reported reserve balance was $746 million – 98.9% higher than the realistic worst case of $375 million.

   c.  In the fourth quarter of 1998 the reported reserve balance was $768 million – 34.7% higher than the realistic worst case of $570 million.

   d.  In the first quarter of 1999 the reported reserve balance was $770 million – 55.6% higher than the realistic worst case of $495 million.

109.    In the second quarter of 1999, Freddie Mac, at the behest of a senior Company official other than the individual defendants, significantly altered the assumptions used in its loan loss reserve model.  As a result of this adjustment, beginning in that quarter the model used unrealistic assumptions about default likelihood and other parameters to estimate the "realistic worst case."  For example, loan loss reserve modelers were instructed by the senior Company official to run several "EXTREME pessimistic scenarios" (caps in original) in calculating the

loan loss reserve, one of which was to use "the lowest historic fair value we've seen in the US and [apply] it across regions." Personnel responsible for assisting in the development of the new model were also instructed by the senior Company official "to try and justify" a $100 million over-reserve, and "to estimate the impact of increasing the loan impairment timeline to 9 and 12 months."

110. The new model had the effect of bringing the Company's reported reserves to a level below its modeled "realistic worst case," but also resulted in the "Freddie Mac Standard" level and the level of the low end of the modeled range to be raised significantly, such that the reported balances at the new higher levels failed to comply with GAAP requirements regarding probability. Because of the unrealistic assumptions used in the new model, the "realistic worst case" generated by the revised model jumped from $495 million in the first quarter of 1999 to $771 million in the second quarter of 1999 – a dramatic increase unexplainable by the characteristics of Freddie Mac's loan portfolio, or any other factors.

111. In connection with this altered loan loss reserve model, from the second quarter of 1999 to the second quarter of 2002, Freddie Mac's reported reserve balance materially exceeded the "Freddie Mac Standard," or best estimate, as generated by the model using the aforementioned unrealistic assumptions, as follows. Quarterly figures were reported on the Company's ISSs, and year-end figures on its Information Statements and Annual Reports:

a. In the second quarter of 1999 the reserve balance was $768 million, 174% higher than the Freddie Mac Standard of $280 million.

b. In the third quarter of 1999 the reserve balance was $768 million – 166% higher than the Freddie Mac Standard level of $288 million.

c.  In the fourth quarter of 1999, the reserve balance was $772 million, 215% higher than the Freddie Mac Standard level of $245 million.

d.  In the first quarter of 2000, the reserve balance was $775 million, 206% higher than the Freddie Mac Standard level of $253 million.

e.  In the second quarter of 2000, the reserve balance was $776 million, 192% higher than the Freddie Mac Standard level of $265 million.

f.  In the third quarter of 2000, the reserve balance was $780 million, 188% higher than the Freddie Mac Standard level of $270 million.

g.  In the fourth quarter of 2000, the reserve balance was $784 million, 187% higher than the Freddie Mac Standard level of $273 million.

h.  In the first quarter of 2001, the reserve balance was $786 million, 187% higher than the Freddie Mac Standard level of $273 million.

i.  In the second quarter of 2001, the reserve balance was $790 million, 315% higher than the Freddie Mac Standard level of $190 million.

j.  In the third quarter of 2001, the reserve balance was $794 million, 124% higher than the Freddie Mac Standard level of $353 million.

k.  In the fourth quarter of 2001, the reserve balance was $801 million, 220% higher than Freddie Mac Standard level of $250 million.

l.  In the first quarter of 2002, the reserve balance was $805 million, 45% higher than the "Best Estimate" of $555 million.

m.  In the second quarter of 2002, the reserve balance was $779 million, 46% higher than the "Best Estimate" of $532 million.

## FIRST CLAIM

**Violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and
Rule 10b-5 Thereunder [17 C.F.R. §240.10b-5]
(Freddie Mac Only)**

112.    Paragraphs 1 through 111 are realleged and incorporated by reference as if set forth fully herein.

113.    Defendant Freddie Mac directly or indirectly, by use of the means and instrumentalities of interstate commerce, the mails or the facilities of a national securities exchange, in connection with the purchase or sale of securities, has with knowledge or recklessly:  (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operate or would operate as a fraud or deceit upon any person.

114.    By reason of the foregoing, defendant Freddie Mac violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5] promulgated thereunder.

## SECOND CLAIM

**Violations of Section 17(a) of the Securities Act
[15 U.S.C. §77q(a)]
(Freddie Mac Only)**

115.    Paragraphs 1 through 114 are realleged and incorporated by reference as if set forth fully herein.

116.    Defendant Freddie Mac, in the offer or sale of securities, by the use of the means or instruments of transportation and communication in interstate commerce or by use of the

mails, directly or indirectly, with knowledge or recklessly, has employed devices, schemes or artifices to defraud.

117. By reason of the foregoing, defendant Freddie Mac violated Section 17(a) of the Securities Act [15 U.S.C. §77q(a)].

## **THIRD CLAIM**

### **Violations of Section 17(a)(2) and (3) of the Securities Act**
### **[15 U.S.C. §77q(a)(2) and (3)]**

118. Paragraphs 1 through 117 are realleged and incorporated by reference as if set forth fully herein.

119. Defendants Glenn, Clarke, Dean and Dossani negligently, in the offer or sale of securities, by the use of the means or instruments of transportation and communication in interstate commerce or by use of the mails, directly or indirectly (a) obtained money by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (b) engaged in transactions, practices or courses of business which operated as a fraud or deceit upon the purchasers of such securities.

120. By reason of the foregoing, defendants Glenn, Clarke, Dean and Dossani violated Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. §77q(a)(2) and (3)].

*  *  *  *  *

WHEREFORE, the Commission respectfully requests that this Court:

(a)    permanently restrain and enjoin defendant Freddie Mac from violating Sections 17(a) of the Securities Act [15 U.S.C. §§77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. §§78j(b)], and Rule 10b-5 promulgated thereunder [17 C.F.R. §§240.10b-5];

(b)     permanently restrain and enjoin defendants Glenn, Clarke, Dean and Dossani from violating Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. §§77q(a)(2) and (3)];

(c)     order defendants Freddie Mac, Glenn, Clarke, Dean, and Dossani to pay disgorgement, together with prejudgment interest;

(d)     order defendant Freddie Mac to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)];

(e)     order defendants Glenn, Clarke, Dean, and Dossani to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)];

(f)     order, pursuant to Section 308 of the Sarbanes-Oxley Act of 2002, that the amount of civil penalties ordered against and paid by the defendants be added to and become part of a disgorgement fund for the benefit of the victims of the violations alleged herein; and

(g)     grant such other relief as this Court may deem necessary and appropriate under the circumstances.

Dated: September 27, 2007
      Washington, DC                Respectfully submitted,

                         SECURITIES AND EXCHANGE COMMISSION

                      By___**/s/ Suzanne J. Romajas**_____
                         Suzanne J. Romajas
                         Peter H. Bresnan
                         Charles E. Cain
                         Margaret S. McGuire
                         100 F St., N.E.
                         Washington, D.C. 20549-4030
                         Tel: 202-551-4473 (Romajas)
                         Fax: 202-772-9245 (Romajas)
                         Email: RomajasS@sec.gov

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

## I.(a) PLAINTIFFS

United States Securities and Exchange Commission

## DEFENDANTS

Federal Home Loan Mortgage Corp.

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT    88888
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Suzanne J. Romajas, Esq.
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-4030
Tel: 202-551-4473

ATTORNEYS (IF KNOWN)

Hyacinth Kucik, Esq.
Federal Home Loan Mortgage Corporation
8200 Jones Branch Drive, Mailstop 202
McLean, VA 22102-3110
Tel: 703-903-2600

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ⊙ 1 U.S. Government Plaintiff
- ◯ 2 U.S. Government Defendant
- ◯ 3 Federal Question (U.S. Government Not a Party)
- ◯ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ◯ 1 | ◯ 1 | Incorporated or Principal Place of Business in This State | ◯ 4 | ◯ 4 |
| Citizen of Another State | ◯ 2 | ◯ 2 | Incorporated and Principal Place of Business in Another State | ◯ 5 | ◯ 5 |
| Citizen or Subject of a Foreign Country | ◯ 3 | ◯ 3 | Foreign Nation | ◯ 6 | ◯ 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

### ◯ A. Antitrust

☐ 410 Antitrust

### ◯ B. Personal Injury/ Malpractice

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

### ◯ C. Administrative Agency Review

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

### ◯ D. Temporary Restraining Order/Preliminary Injunction

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

### ◯  E.  General Civil (Other)     OR     ◯  F.  Pro Se General Civil

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☒ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| O **G. Habeas Corpus/ 2255** | O **H. Employment Discrimination** | O **I. FOIA/PRIVACY ACT** | O **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| O **K. Labor/ERISA (non-employment)** | O **L. Other Civil Rights (non-employment)** | O **M. Contract** | O **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

⦿ 1 Original Proceeding  O 2 Removed from State Court  O 3 Remanded from Appellate Court  O 4 Reinstated or Reopened  O 5 Transferred from another district (specify)  O 6 Multi district Litigation  O 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
Violations of the federal securities laws -- 15 USC 77q(a) and 15 USC 78j(b)

**VII. REQUESTED IN COMPLAINT** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ _____   Check YES only if demanded in complaint
JURY DEMAND:   YES ☐   NO ☒

**VIII. RELATED CASE(S) IF ANY** (See instruction)  YES ☐  NO ☒  If yes, please complete related case form.

DATE 9/27/2007   SIGNATURE OF ATTORNEY OF RECORD _S/ Komajas_

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I. COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III. CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV. CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI. CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.